NOTICE

Decision filed 07/02/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210037-U

NO. 5-21-0037

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* A.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Union County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-JA-2 |
| | ) | |
| Michelle T., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's orders finding that Michelle T. was an unfit parent and that it was in the minor's best interest for Michelle T.'s parental rights to be terminated were not contrary to the manifest weight of the evidence. We affirm the orders.

¶ 2    Michelle T. (Mother) appeals from two trial court orders—the October 13, 2020, order finding that she was an unfit parent and the November 20, 2020, order finding that it was in the best interest of A.P. that Mother's parental rights be terminated.[1] Mother timely appealed these

_____

[1]This appeal is subject to the mandatory accelerated disposition rules of Illinois Supreme Court Rule 311 (eff. July 1, 2018). The timeline for disposition can be modified for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Father and Mother separately appealed. Father's appeals were docketed one month prior to Mother's appeals. This court has determined that contemporaneous filing of the four orders is preferred because of the factual family and adoptive situations at issue.

1

orders on November 24, 2020. For the reasons stated in this order, we affirm the trial court's orders.

¶ 3                                    I. BACKGROUND

¶ 4      A.P., the subject of this case, was born on December 24, 2009. This case began when A.P.'s younger brother, M.P., was born in February 2017. A hotline phone call was made to the Department of Children and Family Services (DCFS) State Central Register on February 10, 2017, reporting that A.P.'s mother had tested positive for marijuana and methamphetamine at the time of M.P.'s birth. Mother had also tested positive for methamphetamine twice during this pregnancy. DCFS was informed that M.P. was experiencing drug withdrawal symptoms. As a result of the positive drug screens, DCFS took A.P., M.P., and their older brother D.P.[2] (then 17) into protective custody.

¶ 5      The State filed its petition for adjudication of wardship and its first amended petition for adjudication of wardship on February 14, 2017, alleging that A.P. was a neglected minor in that he was under 18 years of age and his environment was then injurious to his welfare. See 705 ILCS 405/2-3(1)(b) (West 2014). In support, the State alleged that Mother gave birth to M.P. on February 9, 2017, and that his urine and umbilical cord blood both tested positive for marijuana. Mother also tested positive for marijuana on February 4, 2017, and for methamphetamine on November 14, 2016, and January 9, 2017, during her pregnancy with M.P. David P. (Father) had pending criminal charges for aggravated driving while under the influence (DUI) in Union County in 2014. The criminal charges indicated that Father was under the influence of both cocaine and marijuana. The DUI charge was elevated to a felony because it was the third time that Father had been charged with a DUI. Since the 2014 charge, Father had not participated in

_____

[2]As the cases progressed, D.P. turned 18 years old. D.P. requested that DCFS intervention on his behalf be discontinued. DCFS closed D.P.'s case.

any substance abuse treatment. In the petition for adjudication of wardship, A.P. was alleged to be at substantial risk of harm due to the substance abuse issues of both parents. DCFS noted that this family had a previous history of substance abuse issues. A.P. was born in December 2009 and at birth tested positive for cocaine and marijuana. A.P. was in foster care in that case until March 2012. In the current case, the State asked that A.P. be adjudged as a ward of the court, and that the court grant custody and guardianship to DCFS. On this same date, the trial court appointed a guardian *ad litem* (GAL) on behalf of the three minors.

¶ 6                                        A. Shelter Care Hearing

¶ 7     On February 14, 2017, Mother's shelter care hearing was held. Father was not present at this hearing, and so the court held a supplemental shelter care hearing for him on March 2, 2017. Mother stipulated to A.P.'s removal from the home, indicating that she was doing so only because the children were placed in her daughter's home. The trial court judge was told that M.P. was recently born with marijuana in his system and that Mother had two positive drug tests during the pregnancy for methamphetamine. Mother disputed that there were two positive methamphetamine results. In response, the judge warned Mother: "If the drug use continues, then at some point you're going to get your parental rights terminated. So[,] you probably need to make a decision, not this instant, but you need to make a decision in the near future, because you can't have both. You can't have the kids and you can't keep using drugs."

¶ 8     On February 14, 2017, the trial court entered its temporary order granting custody of A.P. to DCFS. The order was not filed until February 17, 2017. DCFS was directed to set up appropriate services for Mother. The trial court ordered supervised visitation and admonished the parents that "they must cooperate with the Illinois Department of Children and Family Services. The parents must comply with the terms of the service plan and correct the conditions that

3

require the minor to be in care or they risk termination of their parental rights."

¶ 9            B. Second and Third Amended Petitions for Adjudication of Wardship

¶ 10    The State filed its second amended petition on July 27, 2017. The State alleged that A.P. was a neglected minor in that he was under 18 years of age and his environment was injurious to his welfare. The allegations of this petition mirror the statements made by the trial court in its March 27, 2017, temporary custody order.

¶ 11    The State filed its third amended petition on July 31, 2017. The allegations of neglect and injurious environment regarding A.P. were restated. The State alleged that M.P. was born with marijuana in his system; that Mother tested positive for marijuana shortly before birth; that Father had the pending 2014 Union County charge of aggravated DUI; and that the environment was injurious to A.P. because of the substance abuse issues. The State removed the allegations that Mother had tested positive for methamphetamine twice while pregnant with M.P.; that D.P. was at substantial risk of harm due to low parental supervision; that A.P. was born with marijuana and cocaine in his system; that Mother had untreated bipolar disorder; and that Father had not engaged in substance abuse treatment during the pendency of his aggravated DUI charge.

¶ 12                              C. Adjudicatory Order

¶ 13    On August 3, 2017, the trial court concluded that A.P. was abused or neglected by being subjected to an environment that was injurious to his welfare. The court concluded that the allegations of the third amended petition had been proven by a preponderance of the evidence.

¶ 14                              D. Integrated Assessment

¶ 15    The integrated assessment report was completed and approved on June 8, 2017, and was

4

filed with the court on September 18, 2017.[3] Mother was interviewed on March 16, 2017, at her Anna home. She lived in this home with her mother and with Father's mother. Mother is of Puerto Rican background. She grew up in Chicago with her parents and three brothers. Mother's father was an alcoholic and was physically abusive to her mother. DCFS visited their home during Mother's childhood and accused their mother of child abuse. Mother stated that when caseworkers would show up to their childhood home, she and her brothers would show the workers their bodies to demonstrate that there were no marks of physical abuse. Mother told the evaluators that one of her brothers had bipolar disorder. Both of Mother's other two brothers had histories of DCFS interaction with their families. In one case, DCFS accused Mother's mother of abusing a grandchild (one of her brother's children). As a result of the DCFS investigation, Mother's mother moved back to Puerto Rico for five years.

¶ 16    Mother told the evaluators that, as a teen, she was involved with a gang, Spanish Cobras, for a few years, and that she suffered a gunshot wound because of gang activity when she was 15 years old. Mother's last year of school was the tenth grade, but she obtained her GED diploma in 2006. She had five children with two partners, the first at the age of 15. Her relationship with Father had lasted 21 years, but he recently had become involved with another woman. Mother reported that her relationship with Father ended shortly before M.P.'s birth. During the 21 years of her relationship with Father, Mother stated that they had a history of verbal altercations that at

_____

[3]The record on appeal in this case does not contain a copy of the integrated assessment report because DCFS did not file a copy of its assessment in this case—Union County file No. 17-JA-2—*In re A.P.* DCFS prepared one assessment report covering all three boys and listing all three trial court docket numbers. Instead of filing a copy of the report in each case, the State filed the integrated assessment report only in Union County file No. 17-JA-4—*In re M.P.* This appeal involving A.P. (5-21-0037) was filed contemporaneously with the appeal involving M.P., docketed as 5-21-0042. Although not part of the record on appeal in this case involving A.P., pursuant to the powers granted to the appellate court pursuant to Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), we entered a separate order in this case on June 18, 2021, ordering that the September 18, 2017, file-stamped integrated assessment report be added to the record in this appeal *sua sponte*.

times were more aggressive. In one situation, Mother stated that Father was going to hit her, and so she threw an object at him. Mother was currently unemployed, with a job history of working at a McDonald's restaurant and at various nursing homes and residential care centers. As of the date of the interview, Mother had no source of income.

¶ 17    Mother self-reported a 2012 arrest for driving under the influence, but she omitted other crimes that the evaluators discovered from her background check. Those included arrests for battery, criminal trespass to a vehicle, and knowingly damaging property.

¶ 18    During Mother's interview, she denied using drugs other than marijuana during the pregnancies of A.P. and M.P. She admitted to trying marijuana at the age of 15 but claimed she did use it again until she was 17. At the age of 17, she chronically used the drug. She began using cocaine when she was 21, and she said that she did not use cocaine again until December 23, 2009, just before A.P.'s birth. However, she then acknowledged that she "snorted" cocaine once or twice per month during a portion of A.P.'s pregnancy. During the earlier DCFS case that was opened after A.P. was born, Mother's prenatal records revealed that she had tested positive for cocaine five times during her pregnancy with A.P. With two of those positive tests, she also tested positive for marijuana. Mother claimed that all positive cocaine drug tests were "false positives" because she was taking ibuprofen. She said that the last time she used marijuana during M.P.'s pregnancy was two weeks before his birth. She stated that she never used methamphetamine during M.P.'s pregnancy and attributed those two positive results from having used a "vape" that belonged to someone else. Alternatively, Mother claimed that the positive methamphetamine drug tests were the result of prescription antibiotic medication she was taking during M.P.'s pregnancy for Methicillin-resistant Staphylococcus aureus (MRSA). Mother also provided a third alternative, suggesting that perhaps there was methamphetamine "in the weed."

6

She proposed that the reason she used marijuana throughout her pregnancy with M.P. was because the prescription antibiotics for MRSA caused extreme nausea. Mother further reasoned that if her physician would have hospitalized her for the MRSA infection, she would not have had to use marijuana. However, the evaluators noted that Mother had informed her physician that she was not taking the prescribed medication, and thus they questioned the veracity of her claim that the medication caused her nausea. Mother was evaluated for substance abuse in 2010 in the earlier DCFS case. In this case, she had an appointment to complete a substance abuse evaluation in March 2017.

¶ 19 Mother reported that she had suffered from anxiety in the past with panic attacks. In the 2010 DCFS case, she had two sessions of counseling. Mother informed the evaluators that she did not really perceive the need for services, but she was willing to complete an assessment.

¶ 20 Mother seemed to be unaware of the educational issues that A.P. and his older brother D.P. were having. She suspected that D.P. received some form of special education. The evaluators noted that A.P.'s teacher had made numerous attempts to contact the parents about A.P.'s risk of being retained because of truancy and poor academic functioning.

¶ 21 Mother vehemently denied that she was the cause for the removal of her children from the home. She again blamed her marijuana use on her physician who failed to hospitalize her for MRSA treatment. The evaluators found that Mother's parental functioning was severely compromised by her substance abuse and mental health problems. They were concerned that she took no personal responsibility for her situation and kept attempting to shift blame—both behaviors considered to be significant barriers to successful cooperation and meaningful completion of services. The evaluators also stated that they found Mother to be deceitful and thus uncooperative in that her responses about her drug usage were often false.

¶ 22    The evaluators were also concerned that Mother would reunite with Father, stating that her own life experiences being raised in a home where physical abuse occurred "skewed her perceptions." Further, they noted that Mother did not understand how the dynamics of abuse in her relationship with Father negatively impacted her children.

¶ 23    The evaluators recommended that Mother receive several different services. First, they recommended domestic violence services as well as ongoing consultation with the DCFS domestic violence coordinator. The evaluators also recommended that Mother receive a substance abuse evaluation and trauma-informed psychotherapy. Finally, they recommended that Mother receive therapeutic parenting education instead of traditional parenting classes.

¶ 24                                    E. Dispositional Report and Order

¶ 25    In advance of the dispositional hearing, DCFS filed its lengthy dispositional report on August 22, 2017. A copy of the report was also filed on September 18, 2017.[4] The dispositional report only covered about one month—July 27, 2017, to August 22, 2017. The permanency goal set by DCFS was to return A.P. home within 12 months. Mother was not participating in any services, but she expressed her willingness to cooperate with services. DCFS recommended services involving the following areas: substance abuse, parenting, mental health, and domestic violence. Mother was laid off from her employment at Robinson's Produce in Cobden. Visitation had been scheduled and supervised by the caregivers, but DCFS had received information that Mother had engaged in unsupervised and unapproved overnight visits. Therefore, DCFS decided

---

[4]The record on appeal in this case does not contain a copy of the dispositional report because DCFS did not file a copy of its report in this case—Union County file No. 17-JA-2—*In re A.P.* DCFS prepared one report covering all three boys and listing all three trial court docket numbers. Instead of filing a copy of the report in each case, the State filed the dispositional report only in Union County file No. 17-JA-4—*In re M.P.* This appeal involving A.P. (5-21-0037) was filed contemporaneously with the appeal involving M.P., docketed as 5-21-0042. Although not part of the record on appeal in this case involving A.P., pursuant to the powers granted to the appellate court pursuant to Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), we entered a separate order in this case on June 18, 2021, ordering that the September 18, 2017, dispositional report be added to the record in this appeal *sua sponte*.

to change the visitation to be scheduled and supervised by its staff. DCFS noted that Mother was not open about the status of her relationship with Father in that DCFS could not determine if they planned to remain together, which would require services to help the couple attain that goal.

¶ 26 Attached to the dispositional report were separate reports. One of the reports involved the risk factors that resulted in DCFS filing its neglect case regarding A.P. Father was found to have had a history of domestic violence. Mother informed DCFS that she was struck during a pregnancy, but she refused to provide the name of her assailant. DCFS also found that Father caused Mother to experience great anxiety, which interfered with her parenting abilities. DCFS found that Mother had limited flexibility in her parenting, was a polysubstance abuser, and suffered from bipolar disorder and anxiety that caused her to pull out her own hair.

¶ 27 DCFS created the following action steps for Mother with a target completion date of February 9, 2018:

(1) agreement to stop the use of drugs;

(2) agreement to complete a substance abuse assessment;

(3) agreement to successfully complete substance abuse treatment;

(4) agreement to cooperate with random drug tests;

(5) agreement to participate in parenting services through Project 12-Ways;

(6) completion of parenting services through Project 12-Ways;

(7) demonstration of the parenting skills learned in the Project 12-Ways classes;

(8) agreement to participate in an assessment/evaluation and counseling with an approved provider to address domestic violence issues;

(9) agreement to cooperate with domestic violence classes and/or counseling;

(10) agreement to have no domestic violence episodes within the home and within the

9

child's presence;

(11) agreement to complete a mental health assessment through an approved provider;

(12) agreement to cooperate with any recommendations following the mental health assessment;

(13) agreement to demonstrate progress in mental health counseling to address her needs;

(14) agreement to be evaluated in an integrated assessment;

(15) agreement to follow all recommendations made after the integrated assessment;

(16) agreement to be cooperative with DCFS;

(17) agreement to sign all necessary paperwork to allow DCFS to obtain release of information from her service providers; and

(18) agreement to inform DCFS of any changes in her residential address, telephone number, police involvement, employment, or household composition within 24 hours of the change(s).

¶ 28 Mother was found in agreement and/or compliant with 8 of the 18 action steps—agreement to stop the use of drugs as established by a negative random drug test, participation in random drug tests, agreement to participate in parenting services through Project 12-Ways, completion of the integrated assessment, agreement to cooperate with any mental health recommended services, having no reported domestic violence episodes, agreement to sign all releases, and agreement to inform DCFS of any changes in address, telephone, police involvement, employment, or household composition.

¶ 29 The trial court entered its dispositional order on October 20, 2017. The court found that Mother was "unfit to care for, protect, train, educate, supervise or discipline the minor and placement with her was contrary to the health, safety and best interests of the minor." The court

found that the service plan and permanency goal were appropriate. The court granted the State's petition and adjudicated A.P. as neglected, made him a ward of the court, and placed A.P. in the custody of DCFS. Mother was allowed supervised visitation.

¶ 30    DCFS filed an updated report with the court on February 13, 2018. A.P. was then eight years old and was described as healthy, happy, and bonded with his caregivers. Mother had completed assessments through Family Counseling Center—likely a mental health assessment, although not specified by DCFS. DCFS confirmed that Mother completed an assessment verbally, but DCFS had not received written confirmation. DCFS made a parenting referral for Mother to Project 12-Ways, but services had not yet begun. Mother had not yet signed a consent form for domestic violence services. DCFS made no reference to Mother's substance abuse service plans in this status report. Visitation was set for twice per week—one visit was to be supervised by the caregiver and the second was to be supervised by the DCFS provider. Mother participated in no DCFS-supervised visits, apparently because the caseworker and case aides had been unable to reach her.

¶ 31                    F. Permanency and Status Reports and Orders

¶ 32    On March 5, 2018, DCFS filed its permanency report. By that date, A.P. had been in substitute care for 388 days. DCFS stated that A.P. was doing well and was attending school on a regular basis. In addition, A.P. was receiving counseling services. DCFS listed the family safety threats as a history of substance abuse and domestic violence. DCFS stated that Mother had not been cooperative with the recommended services outlined in its service plan and rated her unsatisfactory in all four service plan areas—mental health, substance abuse, domestic violence, and parenting. Specifically, although Mother completed an assessment for mental health and substance abuse services, she had not participated in the recommended services. Project 12-Ways

11

parenting services had not begun, and Mother had not complied with domestic violence services. DCFS noted that Mother's participation with supervised visitation was inconsistent.

¶ 33    DCFS found that the case fit the criteria for legal screening because there had been two unsatisfactory rated service plans since the case was opened in February 2017. The permanency goal remained to be to return A.P. home within 12 months. The recommended date for achievement of this permanency goal was September 2018. The alternate plan for A.P. was an adoptive placement.

¶ 34    On March 8, 2018, the trial court entered its permanency order finding that Mother had not made reasonable efforts, nor had she made substantial progress toward returning A.P. home. Furthermore, the court found that Mother's compliance and progress with her service plan was unsatisfactory. The court's order explained that for Mother to receive a "making reasonable efforts and progress" rating, she needed to remain in contact with DCFS, engage in all recommended services, and provide verification of completed services to the DCFS caseworker. The court found that the services listed in the DCFS service plan were appropriate and reasonably calculated to facilitate the achievement of the permanency goal because the services were designed to address the reasons why A.P. was placed in care. The court ordered that A.P.'s custody and guardianship should continue with DCFS and kept the dispositional order in effect.

¶ 35    On June 8, 2018, the State filed another permanency hearing report in this case. Mother's progress on her service plan was rated unsatisfactory. Communication remained a significant issue. Mother had not responded to several DCFS-scheduled random drug tests, but DCFS noted that Mother took one test on June 1, 2018, that was negative. Otherwise, although Mother had completed a mental health assessment, no services had begun. Project 12-Ways parenting services had not begun. Mother had not complied with the domestic violence service plan.

12

Visitation with A.P. was still supervised and remained inconsistent due to Mother's communication and transportation issues.

¶ 36    DCFS again found that the case fit the criteria for legal screening and that the concurrent plan for A.P. continued to be to return home within 12 months or alternatively an adoptive placement. The recommended date for achievement of this permanency goal was December 2018.

¶ 37    On June 12, 2018, DCFS filed a status report indicating that the agency had met with Mother. As of the date of the report, Mother did not have a working phone. Mother reported that she was currently taking prescription medication for attention deficit hyperactivity disorder and for hypertension. Mother disputed her service plan objectives, stating that the plan did not actually apply to her needs. DCFS learned from the Family Counseling Center that Mother did not attend recommended counseling sessions. Mother informed DCFS that she did not need domestic violence services. The DCFS caseworker's supervisor confirmed that Mother needed domestic violence services. Mother's random drug tests on June 1, 2018, and June 8, 2018, were both negative.

¶ 38    On July 9, 2018, DCFS filed an additional status report with the court. Mother continued to dispute the recommended service plan objectives. DCFS staff reported that Mother was seen at A.P.'s caregiver's home outside of her visitation time, which was not allowed. DCFS stated that this visitation infraction could result in A.P. and M.P. being removed from their relative placement. Mother had missed scheduled drug tests on June 22, 2018, and July 6, 2018. DCFS indicated that it would refer this case for legal screening due to Mother's noncompliance.

¶ 39    The trial court entered a permanency order on July 12, 2018, stating that the permanency goal remained to return A.P. home in 12 months. However, the court found that Mother had not

13

made reasonable and substantial progress toward the permanency goal. The court found that Mother's progress towards substance abuse and mental health service plan goals was unsatisfactory because she had not participated in services. Mother had not begun parenting services or domestic violence services.

¶ 40    On November 19, 2018, DCFS filed a permanency hearing report with the court.[5] DCFS indicated that the lengthy history of substance abuse and domestic violence in the home continued to be safety threats to A.P. However, there had been no reported domestic violence episodes in the past six months. DCFS reported that Mother was not making satisfactory progress or reasonable efforts on her service plan. With both domestic violence and substance abuse services, Mother's progress was graded as unsatisfactory. Mother had assessments with both service providers, but in both cases, the provider determined that Mother did not need further services based upon the assessment. DCFS was concerned about these assessments because of Mother's history of substance abuse, as well as admitted domestic violence in the home. Mother was currently in mental health counseling, and her counselor informed DCFS that although Mother was making progress, further services were needed. Mother was also seeing a psychiatrist to obtain prescribed medications for her mental health needs. Project 12-Ways had not begun, and DCFS indicated that this service would not begin until Mother obtained appropriate housing. Mother was rated satisfactory with her service plan requiring cooperation

_____

[5]The record on appeal in this case does not contain a copy of the November 19, 2018, permanency report because DCFS did not file a copy of its report in this case—Union County file No. 17-JA-2—*In re A.P.* DCFS prepared one report covering A.P. and M.P. and listing both trial court docket numbers. Instead of filing a copy of the report in each case, the State filed the dispositional report only in Union County file No. 17-JA-4—*In re M.P.* This appeal involving A.P. (5-21-0037) was filed contemporaneously with the appeal involving M.P., docketed as 5-21-0042. Although not part of the record on appeal in this case involving A.P., pursuant to the powers granted to the appellate court pursuant to Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), we entered a separate order in this case on June 18, 2021, ordering that the November 19, 2018, permanency report be added to the record in this appeal *sua sponte*.

14

with DCFS. Mother was consistently attending supervised visitation with her sons. Both A.P. and M.P. were in a new foster placement. DCFS did not explain why the foster placement was modified. DCFS stated that both boys were removed from the home of their relative— presumably, from the home of their older sister, Yalissa—and were now in a traditional foster setting. A.P. was doing well in his new school in Herrin and was receiving weekly counseling services.

¶ 41    DCFS again concluded that the case fit the criteria for legal screening and that the concurrent plan for A.P. continued to be to return home within 12 months or alternatively an adoptive placement. The recommended date for achievement of this permanency goal was May 2019.

¶ 42    DCFS filed another permanency hearing report on January 18, 2019. DCFS reported that Mother had not made satisfactory progress or reasonable efforts toward the service plan permanency goal. DCFS contacted the Women's Center in Marion to determine why it concluded that Mother did not need domestic violence services. DCFS learned that Mother had self-reported that there was no domestic violence in the home. Mother was, however, receiving anger management services through her mental health provider. Mother had found housing and would be living with her mother. DCFS indicated that it would be moving forward to set up services via Project 12-Ways. Mother's cooperation with DCFS was rated as satisfactory. All other service goals were rated unsatisfactory. Mother continued to consistently attend visitation sessions. The permanency goal remained to return A.P. home within 12 months, and alternatively, adoption. The new recommended date for achievement of the permanency goal was May 2019.

¶ 43    On February 27, 2019, DCFS filed an addendum to its report filed on January 18, 2019.

In this report, DCFS restated that Mother failed to report the history of domestic violence in the home to the Women's Center evaluator, and thus was found not to need services in this area. DCFS had made repeated unsuccessful attempts to reach the counselor at Centerstone who determined that Mother did not need substance abuse services. DCFS also faxed a copy of Mother's integrated assessment report to Centerstone. Mother reported that she would complete another substance abuse assessment, and DCFS informed Mother that the counselor must be provided with a copy of the integrated assessment to be included in the evaluator's substance abuse assessment. DCFS reported that Mother had completed one random drug test since the last court hearing and that test was positive for opiates. Project 12-Ways was going to set up an appointment to review Mother's file and then set up in-home services.

¶ 44   On February 28, 2019, the trial court entered a permanency order. The court found that the permanency goal should remain to return A.P. home within 12 months. The court found that Mother had not made reasonable efforts or substantial progress toward the permanency goal, and that her progress on services was unsatisfactory in the areas of domestic violence, substance abuse, mental health, and parenting. The court specifically noted that Mother had not been honest during her domestic violence assessment. The court also noted that despite Mother's history of substance abuse, the substance abuse assessment also resulted in a conclusion that she needed no services. Mother continued to participate in mental health services, and was making progress, but her work with the therapist was ongoing.

¶ 45   On April 11, 2019, DCFS filed its updated family service plan dated February 7, 2019. Mother had been rated satisfactory on 7 of the 18 action steps—agreement to sign all necessary information releases, agreement to obtain a mental health assessment, agreement to cooperate with any recommendations resulting from a mental health assessment, agreement not to have

further domestic violence episodes within the home or in the presence of A.P., agreement to be open and honest in her integrated assessment interview, agreement to successfully complete parenting services through Project 12-Ways, and agreement to inform DCFS of any changes in address, telephone numbers, police involvement, employment, or household composition. The report detailed the questionable substance abuse assessment, and the court's order that Mother complete another assessment. DCFS noted that Mother proclaimed that she was substance-free, but that she had missed several random drug tests due to communication and transportation barriers. In addition, DCFS rechecked Mother's criminal record. DCFS found that she had been charged with retail theft of alcohol in October 2017.

¶ 46    On April 26, 2019, DCFS filed a status report with the court. DCFS reported that Mother had begun meeting with the Project 12-Ways provider once per week. The DCFS caseworker spoke with the DCFS supervisor, and DCFS determined that Mother's domestic violence progress would continue to be rated as unsatisfactory considering her inaccurate intake assessment at the Women's Center. The Women's Center reported to DCFS that even though Mother's integrated assessment report reflected a need for domestic violence services, the Women's Center only based its determination that services were or were not needed on its own assessment based upon the parent's reporting. On April 25, 2019, DCFS informed Mother that her domestic violence service plan would continue to be rated as unsatisfactory until classes and/or counseling were completed. DCFS informed the court that it had received reports from a case aide that Mother was living with another man, woman, and children. The caseworker asked Mother if they lived with her, and Mother responded in the negative, but she stated that she occasionally babysat the children. Then, the caseworker asked the children if they lived in that house, and they responded in the affirmative. The caseworker informed Mother that she was

17

currently precluded from acting in a caregiver role for children. The caseworker called the DCFS hotline to report the information.

¶ 47    DCFS filed a status report with the court on June 4, 2019, indicating that the case was sent for legal screening but did not pass and was being held for an additional 30 days for the screener to review additional case information.

¶ 48    DCFS filed another status report with the court on September 9, 2019, indicating that A.P. had recently been relocated from the traditional foster placement to a home of fictive kin because of increased behavioral outbursts. A.P. had been hospitalized two times since July 1, 2019, due to aggressive behaviors and threat of self-harm/suicide. A.P. had refused all visitation with Mother because he was afraid of her.

¶ 49    DCFS filed its next permanency report with the court on October 30, 2019. DCFS reported that Mother had not made satisfactory progress or reasonable efforts toward the permanency goal. DCFS stated that it had no contact information for Mother since her phone number changed, and she had been evicted from her home. DCFS stated that Mother was not compliant with services, and there was no indication that she was engaged in services. Project 12-Ways ended services because Mother was noncompliant and due to the belief that others were living in her home. DCFS reported that A.P. was receiving mental health services and had stabilized with his new fictive kin placement.

¶ 50    DCFS reported that the case passed legal screening on July 23, 2019. Thus, the requested permanency goal had changed from return home in 12 months to substitute care pending court determination on termination of parental rights. DCFS explained that the original permanency goal could not now be achieved because that would mitigate the circumstances that brought A.P. into care. Furthermore, DCFS stated: "Returning these children to their parents who are still in

18

contact with and maintain a relationship with one another would be detrimental to the health and well[-]being of the children." DCFS explained that termination of parental rights was in A.P.'s best interest because "[t]he parents have not corrected the conditions which brought the children into care *** [and] continue to engage in behaviors that are not congruent with minimum parenting standards *** [and] put the children at immediate risk of harm."

¶ 51　The trial court entered its permanency order on October 31, 2019. Even though the case had passed legal screening, the trial court maintained the permanency goal to return A.P. home within 12 months because of a new assertion. Father had alleged that his mother was a member of a Native American tribe, and thus verification of this genealogy was required to determine if A.P. was eligible to be a member of this tribe. If A.P. was eligible to be a member of the Native American tribe, the Indian Child Welfare Act (25 U.S.C. § 1901 *et seq.* (2018)) would apply and would require the court to apply federal standards for A.P.'s foster and adoptive placements.

¶ 52　DCFS filed its next permanency report with the trial court on February 13, 2020. Mother had begun domestic violence counseling in September 2019, but DCFS had no record of her attendance or completion of services since that time. Mother's contact with DCFS was limited until January 2020, when she provided a new telephone number and address. Mother was not engaging in mental health or substance abuse services at that time. DCFS found that Mother had not corrected the conditions that brought A.P. into care. DCFS stated that Mother's behavior had escalated since she stopped services. Further, DCFS ended Mother's visitation sessions on several occasions because her behavior was erratic. DCFS suspected that Mother was continuing to engage in substance abuse.

¶ 53　DCFS noted that Father had claimed that the Indian Child Welfare Act was applicable to this case because he was of Choctaw descent. However, documentation from the Mississippi

Band of Choctaw Indians indicated that although A.P.'s paternal grandmother was 50% Choctaw, and that made her eligible to be a member of the Mississippi Band of Choctaw Indians, Father was not eligible for tribal membership. Thus, A.P. was also not eligible for tribal membership, and the Indian Child Welfare Act was inapplicable. DCFS requested a permanency goal of substitute care pending court determination of termination of parental rights.

¶ 54  DCFS filed its permanency report with the court on June 30, 2020. DCFS asked the trial court to order substitute care pending its determination on termination of parental rights. Mother was rated as not making satisfactory progress or reasonable efforts toward the permanency goal.

¶ 55  As of June 30, 2020, DCFS found that Mother was not compliant with any aspect of her service needs. Her behavior was described as sometimes respectful, while at other times angry and accusatory. Mother has stated in front of the children and to others that she would like to stab the caseworker assigned to her case. DCFS again noted that Mother's phone number frequently changed, and that communication was difficult. Mother was not currently engaged in substance abuse, mental health, or domestic violence services. She had completed a victim domestic violence course. However, Mother had not received aggressor domestic violence services. Mother had been inconsistent with visitation. Mother stated that she was then employed in a nursing home, but she had not provided DCFS with documentation. Mother informed DCFS that she was happily married to Father and that they lived together. Meanwhile Father told DCFS that he was not living with Mother. The location of her home was an issue because she had provided two disparate statements about the location of her home.

¶ 56  A.P. was doing well with psychiatric and psychological services. He was excelling at school and with his foster parents. He told the DCFS caseworker that he "was done" with his parents. He explained that he was fearful of his mother because he had witnessed her violent acts

against his father. A.P. reported that he was looking forward to being adopted, that his foster family loved him, and that he knew that he belonged with them. A.P.'s foster parents advocated for an end to parental visitation. A.P. reportedly suffered emotional ill effects before and after visitation because A.P. was afraid that he would have to return home to his biological parents.

¶ 57    Mother continued to have supervised visitation, and during the Covid-19 pandemic, the visitation sessions were via videoconference. DCFS again noted that Mother exhibited erratic behavior during visitation. DCFS stated that Mother displayed a lack of empathy and parenting skills with inappropriate conversations, an inability to understand A.P.'s nonverbal cues, and a failure to provide a food or snack at mealtimes when the visitation sessions were in person. Overall, Mother did not have the ability to understand that her behavior impacted the mental health and well-being of A.P.

¶ 58    On July 7, 2020, the trial court entered its permanency order finding that the appropriate permanency goal was substitute care pending the hearing on the State's motion to terminate Mother's parental rights. The court noted the length of time that A.P. had been in foster care, that A.P. was entitled to permanency, that Mother had failed to complete any services required, and that there was "no sign" that further services would result in progress.

¶ 59                         G. Termination of Parental Rights

¶ 60    The State filed its motion for termination of parental rights on October 30, 2019. The hearing on the State's motion was delayed for almost one year due to Father's incarceration and his invocation of the Indian Child Welfare Act. The hearing on the State's motion was held on October 13, 2020.

¶ 61    The State alleged that Mother was unfit for the following reasons as outlined in the Illinois Adoption Act (750 ILCS 50/1(D) (West 2018)):

21

(1) Failure to maintain a reasonable degree of interest, concern, or responsibility as to A.P.'s welfare (*id.* § 1(D)(b));

(2) Failure to protect A.P. from conditions within his environment that were injurious to A.P.'s welfare (*id.* § 1(D)(g));

(3) Commission of other neglect of A.P. or misconduct toward A.P. (*id.* § 1(D)(h)); and

(4) Failure by a parent:

> (a) To make reasonable efforts to correct the conditions that were the basis for removal of the child from the parent during any nine-month period following the adjudication of neglected or abused minor (*id.* § 1(D)(m)(i)); and/or

> (b) To make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglected or abused minor (*id.* § 1(D)(m)(ii)).

In conclusion, the State asked the trial court to find that Mother was an unfit parent.

¶ 62    In a separate document filed on October 30, 2019, the State specified the alleged nine-month periods upon which it relied in its motion to terminate parental rights. The State relied upon two nine-month periods: September 21, 2017, to June 21, 2018; and June 21, 2018, to March 21, 2019.

¶ 63    The hearing was held on October 13, 2020. The first witness to testify was Amy Tango. Tango testified that she was currently employed by Caritas Family Solutions as a foster care case manager. She was previously employed by Lutheran Social Services and was assigned as the DCFS caseworker on A.P.'s case from February 2017 until February 2019. Tango testified that Mother completed an integrated assessment at the beginning of services and that, based on the integrated assessment, she was required to undergo a mental health assessment, substance abuse

assessment, domestic violence services, and parenting classes. She was also required to comply with DCFS requests. Tango testified that Mother completed a domestic violence assessment and reported that there was no domestic violence in the home. Thereafter, the provider concluded that Mother did not need services. However, this provider was not provided with a copy of the integrated assessment. Later, the trial court ordered her to return to have domestic violence services. Part of the substance abuse process was scheduled random drug tests. During the two years that Tango worked on this case, the parents failed to appear for the scheduled drug tests on more than five occasions. In addition, in early 2019, Mother tested positive for opiates on a random drug test. Throughout the two years Tango was assigned to the case, Mother made little progress on her service plan action steps. However, Tango testified that Mother participated in visitation. Tango stated that, based on the two years she was assigned to this case, Mother's lack of progress made her an unfit parent.

¶ 64    Mallory Bollinger was next called to testify. Bollinger was a foster care supervisor for DCFS. Bollinger's job was to guide and supervise the foster care caseworkers. However, she was not the supervisor for the four assigned caseworkers on this case. To prepare for her testimony, she reviewed the files. She testified that Mother had made some progress on her service plan. Although DCFS reports to the trial court indicated that Mother had been discharged from Project 12-Ways, Bollinger testified that this was incorrect in that Mother did complete that service task. Additionally, Mother completed a victim domestic violence course in October 2019, but she had not received aggressor domestic violence services, and so her progress was unsatisfactory. Mother had a substance abuse evaluation at Centerstone in August 2018, during which she disclosed past marijuana use. However, she did not disclose that she tested positive for methamphetamine twice during her pregnancy with M.P., that A.P. was born substance exposed,

23

or that M.P. was born substance exposed. The service provider diagnosed her with marijuana use in remission and did not recommend services. Bollinger testified that Mother should have been evaluated as needing substance abuse services. Of gravest concern to Bollinger was that DCFS contacted Mother for 21 random drug screens, but she believed Mother attended only 2: on June 1, 2018, and June 8, 2018. Bollinger testified that all clients are informed that if they do not show for a random drug test, their failure to show will be treated as a presumptive positive result. Overall, Bollinger testified that, in her opinion, based upon her review of the records, Mother should be found to be an unfit parent.

¶ 65    Mother testified at the hearing that she is the mother of A.P. and M.P. Mother testified that, at the beginning, DCFS informed her that she needed to complete services for mental health and substance abuse. She testified that domestic violence services were not included on the original service plan, but she completed victim domestic violence classes only to be told that she also needed to also take aggressor domestic violence classes. Mother denied that she or Father were physically abusive to each other, and she further denied telling the evaluators during the integrated assessment that when Father was going to hit her that she threw something at him. She testified that she had three substance abuse evaluations, but only the Centerstone one had been discussed. She stated that M.P. never tested positive for methamphetamine at birth, but she confirmed that she tested positive for methamphetamine in November 2016 and in January 2017, before M.P. was born. Mother testified that her positive methamphetamine tests during the pregnancy were the result of prescription medication she was taking to combat a MRSA infection. She denied that she told Centerstone only about marijuana. Mother also testified that she had only been contacted about having a random drug test perhaps six times. She testified that she had completed the Project 12-Ways parenting program. Mother denied that she ever changed

her telephone number. She accused DCFS of not being communicative with her, stating that she had to "stalk" the caseworkers to receive a response.

¶ 66    At the conclusion of testimony, the court allowed the attorneys to make arguments. The State argued that Mother was unfit in that she made little effort to correct the conditions that brought A.P. into care. Despite her claims that domestic violence services were added a year into this case, the State pointed out that those services were recommended in the original service plan. The State argued that Mother lied during her substance abuse evaluation, and further that no prescribed medication can provide a false positive for methamphetamine. The State argued that Mother was not credible and that much of her testimony was nonsensical. Although Mother completed the Project 12-Ways service in August 2019, she did not complete her other required services.

¶ 67    Mother's attorney argued that the foundation for this case was that M.P. was born with marijuana in his system. He argued, therefore, that earlier methamphetamine positive drug tests were irrelevant. Mother's attorney argued that she completed the domestic violence services that the Women's Center determined she needed, and that additionally she completed Project 12-Ways services. In conclusion, he argued that the State had not established that Mother was an unfit parent by clear and convincing evidence; that she loved A.P.; and that she tried to comply with the DCFS directives.

¶ 68    The GAL stated that while he understood Mother's argument, this was not the first time that Mother, Father, and their children were involved with DCFS. He argued that the overriding issue was drug usage and that the case was not about whether Mother and Father loved their children. The GAL argued that it was unfair to keep A.P. on hold. He argued that the issue came down to credibility of the witnesses, stating that no one was able to dispute the testimony about

25

missed random drug tests. He argued that random drug tests were missed "due to the sole fault of the parents and *** that *** shows that they have not maintained that reasonable degree [and] *** [t]hey have not attempted to correct the elements that resulted in the children being taken from their home."

¶ 69    The trial court found that Mother had maintained a degree of interest toward A.P. Thus, the court concluded that the State failed to meet its burden to terminate Mother's parental rights on that basis. The court noted that mother made efforts later in the case to participate in offered services. However, the court determined that the primary issue with Mother was her failure to pursue substance abuse services. The court mentioned the multiple missed random drug tests, stating that the court often cautions people "that failure to take drug tests is viewed as a positive drug test." The court noted that Mother had not presented herself for random drug tests throughout most of this case, including during both nine-month periods relied upon by the State. The court found that Mother made no effort to complete any of the services during those periods. On that basis, the trial court concluded that Mother was an unfit parent.

¶ 70                                   H. Best Interest Hearing

¶ 71    On November 23, 2020, the trial court held a hearing on the best interest of the minor. Several witnesses testified during the hearing.

¶ 72    The first witness called by the State was Mallory Bollinger, the DCFS foster care supervisor. Bollinger testified that she met with A.P. on four occasions in October and November 2020. A.P. was 10 years old on the date of the best interest hearing. He was living with a foster family in Illinois. The parents of his foster mother had been A.P.'s foster parents when DCFS placed him after his December 24, 2009, birth. A.P.'s former foster parents currently live in Iowa and want to adopt him. Although A.P. only lived with them for

26

approximately one year after he was born, DCFS contacted this family during this case to see if they would be willing to foster A.P. in this new case. While they were interested, the family no longer lived in Illinois and suggested their daughter and her husband as A.P.'s local foster parents. Bollinger testified that if the adoption fell through for the Iowa couple, his local foster parents have said that they would adopt A.P. A.P.'s foster family had been meeting his mental health, educational, and shelter needs. A.P. was happy in his current Illinois placement, but he was looking forward to moving to Iowa to live with his future adoptive family. A.P. was aware that he would not be able to routinely see M.P. and said that he will miss his older brother, D.P., but informed Bollinger that he will not miss his two oldest siblings. A.P. told Bollinger that he was fearful of both of his biological parents. Bollinger testified that she believed that it would be in A.P.'s best interest for Father's parental rights to be terminated and to allow the Iowa family to adopt him.

¶ 73    Tony Geiselman, a DCFS mental health counselor, testified that he had been providing weekly counseling sessions to A.P. since August 2017. He testified that when he began counseling A.P., A.P. was sad and confused about the removal from his family. However, as time passed, A.P. became angry about his situation. Geiselman confirmed that A.P. suffered some psychiatric issues during the summer of 2019 and had to be moved from the foster placement he shared with M.P. and moved to his current foster home. Although A.P. is no longer placed with his little brother, M.P., Geiselman testified that A.P. is content knowing that his brother is safe. He stated that A.P. characterized his overall feelings with his current foster family as "safe." Geiselman characterized A.P.'s attitude as one of frustration with his parents but hope and excitement about his future life in Iowa. He testified that A.P. understands that he will no longer be geographically close to his biological parents or siblings. While A.P. would

27

like to maintain contact with D.P. and hopes to be able to visit with M.P., Geiselman testified that A.P. is ready for permanency.

¶ 74    Mother testified on her own behalf. Since the hearing where the court found that she was an unfit parent, she had gone to Rural Health, Inc. in Anna for weekly drug tests. The only negative test result confirmation document she had received by the date of the hearing was for November 2, 2020. However, she was told after each test that her results had been negative. She testified that before the fitness hearing, she had missed two drug tests because the DCFS caseworker provided her with an incorrect address. Mother claimed that the best interest of A.P. was to allow his return home. She testified that A.P.'s suicide attempt occurred because he had been told that he may be adopted. She testified that after his hospitalizations, he was being medicated and that his foster caregivers would have him lie down with a weighted blanket placed over him. Mother referred to this treatment as neglect. Mother acknowledged that she had expressed anger towards the DCFS caseworkers, testifying that she hated them, that they did not listen, and that they treated her as if she did not exist. Mother testified that she now had a new address because the caseworker told Father that he had to break up with her. Mother said that she had been unemployed for the past three years. She explained that she could no longer obtain employment in the healthcare field because of the abuse charges. She testified that her current house, which she shared with two other people, was large enough to accommodate her two children. She stated that neither of her roommates used drugs. Mother also testified about her three adult children and about the closeness of her relationship with them.

¶ 75    At the conclusion of the hearing, the trial court allowed argument. The State argued that the issue was not about what Mother desired or needed and was not about relitigating her fitness as a parent. The only factor to be considered was what was in A.P.'s best interest. The State

reviewed the testimony and reminded the court that A.P. was in favor of the adoption plans. Further, if for some reason the interstate adoption was not possible, his current foster parents would adopt him. The State argued that it had met its burden of proving that termination of Mother's parental rights was in A.P.'s best interest by the preponderance of the evidence. In support, the State cited to the testimony of A.P.'s mental health therapist and the DCFS supervisor, Bollinger. Mother's attorney argued that DCFS could not be acting in A.P.'s best interest by suggesting that Father end his marriage to Mother. The GAL acknowledged that the parents were successful in their attempts to regain custody of A.P. after his birth. However, as they had not been successful in this case, A.P. deserved permanency and a lack of future disruption. The GAL asked the court to terminate Mother's parental rights.

¶ 76    The court began its order by noting that Mother loved A.P. The court stated that although Mother had older adult children, there was little testimony demonstrating significant family ties between these adult children and A.P. Instead, the trial court focused on A.P.'s lengthy foster placement during this case and on the fact that A.P. had been placed in DCFS guardianship and custody at birth. The court also expressed concern about the family and its attempts to thwart the rules. A.P. and M.P. were removed from their placement with their older sister, Yalissa, and their grandmother because Yalissa and the grandmother defied DCFS rules and allowed Mother to have unsupervised, unscheduled, and overnight contact with A.P. without DCFS's approval or knowledge. The court also noted that Mother began working more diligently towards her service plan goals as the case was nearing its conclusion. The court stated the difficulty that transpires from late attention to service plan objectives is that the children become attached to the persons with whom they are living—the persons who are caring for and bonding with them every day. In finding that it was in A.P.'s best interest to grant the State's motion for termination of parental

29

rights, the trial court stated:

> "I have parties who have not participated, do not have significant relationships at this point with their children. I have testimony of a counselor that [A.P.] believes he is safe and just wants [M.P.] to be safe, but in no discussion about safety does it involve being with the parents."

¶ 77 On November 24, 2020, the trial court entered its permanency order. The court changed A.P.'s permanency goal to adoption.

¶ 78                                    II. ANALYSIS

¶ 79 Mother appeals, asking this court to reverse the trial court's orders finding that she was an unfit parent and that termination of her parental rights was in A.P.'s best interest.

¶ 80 Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). The procedure involves two steps. With step one the State must prove, by clear and convincing evidence, that the parent is unfit as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2018); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 81 On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL

App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 82    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Mother met any of the alleged definitions of an "unfit person" contained in the State's motion for termination of parental rights. The trial court found that the State did not meet its burden of proof on the issue of whether Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to A.P.'s welfare. The trial court did not comment upon the bases alleged by the State—that Mother failed to protect A.P. from injurious conditions within his environment and that she committed other neglect of A.P. and/or misconduct toward A.P. However, the trial court determined that the State met its burden of proof that Mother had failed to make reasonable efforts and failed to make reasonable progress during both nine-month periods relied upon by the State: September 21, 2017, to June 21, 2018, and June 21, 2018, to March 21, 2019.

¶ 83    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 84    "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1067). "The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives

31

in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 85 We review the evidence in this case to determine whether the trial court correctly concluded that Mother did not make reasonable efforts to correct the conditions that resulted in A.P.'s removal from the home. Here, the conditions that were the basis for A.P.'s removal from the home stemmed from his younger brother's birth. A.P.'s brother, M.P., was born with marijuana in his system. Furthermore, A.P. had been born with cocaine and marijuana in his system and the family was the subject of another DCFS case. The integrated assessment performed by DCFS indicated that domestic violence, substance abuse, and mental health were all of concern with Mother, and DCFS created a service plan around these concerns.

¶ 86 Overall, we find that it is too simplistic to view this case as involving a Mother who uses marijuana, as Mother's attorney projects. Instead, DCFS's initial assessment and concern was that Mother had a significant polysubstance abuse problem. That assessment was prescient. Mother had tested positive for methamphetamine during M.P.'s pregnancy. She continued to advance theories that prescription antibiotics she was taking for MRSA resulted in false positives for methamphetamine. Notably, she had no expert evidence backing up her unscientific claims. Mother also missed at least 17 random drug tests. DCFS informs all parents required to submit to random drug tests that they must always keep their phones turned on and keep the phone on their persons because the test must be "random," with no advance warning, and the test must be

32

completed that same day. DCFS also tells all parents who are subject to random drug tests that failure to answer the phone to receive the notification that a random drug test has been scheduled and/or failure to show up to undergo the random drug test will be treated as a presumptive positive test. Mother missed at least 17 of these tests. Mother's first test dated between July 27, 2017, and August 22, 2017, was negative. Another two tests—on June 1, 2018, and on June 8, 2018—were also negative. However, the only other random drug test taken by Mother was in early 2019, and that test was positive for opiates. Mother testified in court that she did not receive all 17 of these "missed" random drug test notifications, acknowledging that she may have received 6 notifications. By this testimony, Mother seemed to theorize that DCFS fabricated most of these random drug test notifications.

¶ 87    Another problem that DCFS had with Mother involved her truthfulness. Mother was sent to substance abuse and domestic violence providers but failed to tell them the entire background of her case. Instead of telling the substance abuse providers that she tested positive for methamphetamine or that she had given birth to two drug-exposed children, Mother chose to tell the provider that she formerly used marijuana. When she was assessed by the domestic violence provider, Mother told the evaluator that there was no domestic violence in the home. This level of dishonesty or omission, when faced with the prospect of having her parental rights terminated, defies logic. Perhaps Mother thought that if she only provided part of her factual background, and the omission resulted in the service provider excusing her from needing to complete that service task, that DCFS would mark the service as being "completed." Regardless, these were choices Mother made. Those choices resulted in prolonging the service plan.

¶ 88    Finally, DCFS noted that Mother struggled with compliance. The record indicates that the longer that Mother had to deal with DCFS caseworkers, the angrier and less compliant she

became. Mother threatened to stab her caseworker, and she testified in court that she hated the DCFS caseworkers. These compliance failures and animosity toward DCFS did not assist Mother in completing her service plan tasks.

¶ 89 We next turn to the two relevant nine-month periods—September 21, 2017, to June 21, 2018, and June 21, 2018, to March 21, 2019. Just before the first nine-month period began, DCFS filed its dispositional report which outlined the 18 action steps assigned to Mother's service plan. Before September 21, 2017, Mother was found compliant with 8 of the 18 action steps. She had completed the integrated assessment, had cooperated with DCFS, and had agreed to service recommendations. By February 13, 2018, when DCFS filed a status report with the trial court, the situation had changed. Then, Mother had only received her mental health assessment. As of mid-February 2018, Mother had not complied with her substance abuse or domestic violence service plans. Although Mother had been provided with two supervised visits each week—one with the caregiver and the other with a DCFS provider—there was no documentation of the DCFS provider visits. Moreover, caseworkers and aides were not always able to reach Mother.

¶ 90 DCFS filed a permanency report on March 5, 2018, that reflected an unsatisfactory rating on Mother's service plan. Mother had not then complied with any of the four service plan areas: mental health, substance abuse, domestic violence, or parenting. Mother's visitation was inconsistent.

¶ 91 DCFS filed another permanency report on June 8, 2018, that also reflected an unsatisfactory rating on Mother's service plan. DCFS was struggling to communicate with Mother.

¶ 92    DCFS had been contacting Mother to come in for random drug tests. Mother did not show up for several of those test appointments. Mother did take a random drug test on June 1, 2018, and then again on June 8, 2018, and both tests were negative.

¶ 93    Then in early 2019, before the end of the second nine-month period utilized by the State, Mother was required to appear for a random drug test. Mother tested positive for opiates.

¶ 94    Considering Mother's efforts on a subjective basis, we find that the trial court correctly concluded that Mother did not show reasonable efforts to address the problems that led to A.P.'s removal from the home. The primary issues in this case were substance abuse and domestic violence. While Mother had been able to have A.P. returned home in the first DCFS case after some substance abuse care, she made virtually no effort this time. She received a mental health assessment and took four random drug tests—of which one was positive for opiates. Visitation was characterized as inconsistent if supervision was supposed to be by a DCFS case aide. Mother's visitation at her daughter's home, when her daughter was the supervisor, was apparently consistent. Mother did not engage in substance abuse-related services and missed many scheduled random drug tests. The Project 12-Ways referral had been made, but parenting classes had not started. Overall, DCFS offered Mother the required services, and Mother failed to communicate and failed to work the service plan.

¶ 95    We next review the evidence in this case to determine if the trial court correctly concluded that Mother also failed to make reasonable progress to correct the conditions that resulted in A.P.'s removal from the home. Looking at this from an objective consideration, Mother did not make reasonable progress. The court repeatedly warned the parents about the need to comply with the service plans. We acknowledge that Mother had two negative random drug tests at the end of the first nine-month period and that she completed her mental health

35

examination. However, she did nothing else toward the completion of her service plan. As stated earlier, the benchmark for reasonable progress is compliance with the service plan and the court's directives. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d at 216-17). Moreover, missing scheduled random drug tests, and testing positive on one random drug test, was devastating to an objective review of Mother's progress when substance abuse was at the foundation of DCFS's decision to remove A.P. from the home.

¶ 96    We find that the trial court fully considered the evidence in the record and at the fitness hearing. We conclude that the trial court's finding that Mother was an "unfit person" was not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 97    Once a trial court finds a parent to be an "unfit person," the court must then consider the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
> > (i)    where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
> >
> > (ii)    the child's sense of security;

36

(iii)     the child's sense of familiarity;

(iv)     continuity of affection for the child;

(v)      the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

Here, the trial court did not specifically identify which factors it considered in its verbal or written orders. However, the trial court's ultimate determination and order does not need to reference and discuss each factor. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 98     On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 99     In this case, the record clearly reflects that termination of Mother's parental rights was the appropriate outcome for A.P. In A.P.'s short life, he had twice been removed from the home

of his parents. On the date of the court's termination order, A.P. had been in foster care for three years and nine months. The testimony and other evidence indicated that A.P. had thrived in his most recent placement and that his physical and mental health needs were more than amply being met. A.P. also renewed his relationship with the foster care providers he had as an infant. This family wishes to adopt A.P., and A.P. is willing and excited about this move, the adoption, and permanency. A.P. has a backup adoption offer from the Iowa couple's daughter, who is A.P.'s current foster mother. Although A.P. will not likely see his younger brother M.P. as often as he does now after he moves to Iowa, the Iowa family and M.P.'s foster mother have agreed to continue contact. As this case nears the fourth year of substitute care, the trial court's conclusion that A.P. deserved the permanency and security he craved is appropriate. We find that the trial court's order is not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 100                                    III. CONCLUSION

¶ 101   For the foregoing reasons, we affirm the judgments of the Union County circuit court finding that Mother was an unfit parent and that her parental rights should be terminated.


¶ 102   Affirmed.